UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| PAMELA HARTIG, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) 3:11-cv-00074-RLY-WGH |
| OLD NATIONAL BANK, | ) |
| | ) |
| Defendant. | ) |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Pamela Hartig, is a former employee of Old National Bank ("ONB"). In her Complaint, she alleges that her termination was in retaliation for engaging in protected oppositional activity under Title VII of the Civil Rights Act of 1964, as amended ("Title VII"). ONB now moves for summary judgment. For the reasons set forth below, the court **GRANTS** its motion.

**I.    Factual Background**

  **A.    Plaintiff's Position and Work Hours**

Prior to her termination, Plaintiff worked in the ONB Collections Department in Evansville, Indiana. (Deposition of Pamela Hartig ("Plaintiff Dep.") at 10). Crystal Sturgeon was her supervisor. (*Id.*). In addition to Plaintiff, Sturgeon supervised seven other employees, two of whom, Karen Bushrod and Darnell Granderson, are African-American. (Deposition of Crystal Sturgeon ("Sturgeon Dep.") at 8). Sturgeon, Plaintiff,

1

and the balance of Sturgeon's subordinates are Caucasian. (Plaintiff Dep. at 47; Sturgeon Dep. at 8).

Sturgeon and the employees she supervised worked in cubicles in close proximity to one another. (Plaintiff Dep. at 12-15; Plaintiff Dep. Exs. 2-5). Sturgeon's cubicle has slightly higher walls than her subordinates' cubicles, thus making Sturgeon's cubicle more like an office. (Plaintiff Dep. Exs. 2-5).

Plaintiff's job entailed calling customers on the telephone in an effort to collect money that was owed to ONB. (Sturgeon Dep. at 10-11). To help Plaintiff meet her goal of 16 calls per hour, and at Sturgeon's suggestion, Plaintiff worked two Saturdays per month from 8:00 a.m. to 12:00 p.m. (Plaintiff Dep. at 44; Sturgeon Dep. Ex. 3 (noting hours of operation)). Other Collections Department employees worked one Saturday per month. (Plaintiff Dep. at 45). On the weeks that Collections Department employees worked a Saturday shift, they were able to off-set their Saturday hours by working half a day one day during the week. (*Id*. at 44-45). This was known as a "comp day." (*Id*.). Plaintiff normally took her comp day on Tuesday. (*Id*. at 46). Bushrod and Granderson each took a comp day on Friday. (*Id*. at 83).

      **B.**    **The January 27, 2011, Memo and Plaintiff's Request**

On Thursday evening, January 27, 2011, due to a gradual reduction-in-force in the call center, Kevin Blaylock, Vice President of Collections and Sturgeon's manager, e-mailed a memo to his employees regarding a new work schedule for the department. (Plaintiff Dep. at 34, 48; Plaintiff Dep. Ex. 20). The memo did not change Plaintiff's

regular work hours or her comp days off. (Plaintiff Dep. at 49; Sturgeon Dep. at 15; Sturgeon Dep. Ex. 3).

After reading the memo the following day (Friday), Plaintiff asked Sturgeon if she would change Plaintiff's comp days to one Thursday and one Friday a month. (Plaintiff Dep. at 54). Sturgeon informed Plaintiff that changing her comp days would be very complicated. (*Id.*). Plaintiff replied that if working only one Saturday a month would make it easier for Sturgeon to schedule her comp day on Friday, she [Plaintiff] would talk to her husband about working one Saturday a month. (*Id.*).

### C. The Events of Saturday, January 29, 2011

On Saturday morning, January 29, 2011, Plaintiff sent an e-mail to co-worker Linnzi Baumann stating that she would "fight" for a Friday comp day. (Plaintiff Dep. Ex. 21). Plaintiff admitted when she sent the e-mail, she was "mad." (Plaintiff Dep. at 92). Plaintiff then sent Sturgeon an e-mail stating that she wanted to meet with her. (Plaintiff Dep. at 58).

Plaintiff, still "upset," went into Sturgeon's office cubicle and told Sturgeon that she felt like she was being "picked on." (*Id.* at 58, 60). After Sturgeon tried to explain the complicated nature of Plaintiff's request, Plaintiff walked out of Sturgeon's office cubicle, telling Sturgeon ". . . that [they] didn't have anything else to talk about." (*Id.* at 61). Sturgeon then followed Plaintiff out of her office cubicle toward her [Plaintiff's] cubicle, and asked Plaintiff to talk with her in the conference room. (*Id.*). Plaintiff refused. (*Id.*). Sturgeon asked Plaintiff to "please" go into the conference room a second time. (*Id.* at 62). Plaintiff refused, informing Sturgeon, in a raised voice in front of her

3

co-workers [Granderson, Bushrod, Baumann, and Jessica Sweetwood], that she "needed to talk to all of [them] together [referring to Granderson, Bushrod, and Baumann] so [they would all] get the same story." (*Id*. at 61-64). Plaintiff finally agreed to go into the conference room when she noticed that Sturgeon "had tears in her eyes . . . ." (*Id*. at 67).

When the two entered the conference room, Plaintiff said to Sturgeon, "Well I feel the only reason that Karen [Bushrod] is getting this [Friday comp day] is because she's black." (*Id*. at 68). Sturgeon, recognizing that Plaintiff was very upset, asked Plaintiff if she was okay. (*Id*. at 71). Plaintiff testified that she immediately recognized what she said could subject her to termination. (*Id*. at 75). She therefore apologized to Sturgeon for lodging that accusation. (*Id*.). Sturgeon agreed to "try her best to get the Friday for [Plaintiff]." (*Id*. at 71).

On Monday, January 31, 2011, after Plaintiff informed Sturgeon she would work only one Saturday a month, Sturgeon told Plaintiff she could have a Friday comp day. (*Id*. at 62).

### D.     The Investigation

After Sturgeon's meeting with Plaintiff on January 29, 2011, Sturgeon called Blaylock on his cell phone to ask him if she managed the situation appropriately "[b]ecause [she] had never as a supervisor encountered anything like that or anyone acting like that or talking to [her] that way." (Sturgeon Dep. at 36). By the time Blaylock was able to return her phone call, Plaintiff and the other ONB employees had left for the day. (Deposition of Kevin Blaylock ("Blaylock Dep.") at 13). They agreed to talk to Human Resources on Monday, January 31, 2011. (*Id*. at 14).

Blaylock and Sturgeon met with George Lance, the Vice President of Human Resources at ONB, the following Monday as planned. (Blaylock Dep. at 14; Affidavit of George Lance ("Lance Aff.") ¶ 2). Lance and Blaylock conducted an investigation, which included interviews with Bushrod, Granderson, and Sweetwood. (*Id*. ¶ 6). Their accounts reflect that Plaintiff was angry and upset over the comp day issue, spoke to Sturgeon with a raised voice (Bushrod described Plaintiff as "yelling and screaming"), used inappropriate language with a disrespectful tone, and refused, at least once, Sturgeon's request to discuss the matter in the conference room. (*Id*. ¶¶ 8-10).

Lance and Blaylock also interviewed Sturgeon and Plaintiff. (*Id*. ¶¶ 6, 12, 13). The general thrust of Sturgeon's recollection is consistent with her subordinates' accounts noted above, although it is much more detailed. (*Id*. ¶ 12). Worthy of note is Sturgeon's account of Plaintiff slapping her hand down on Sturgeon's desk and stating, with a pointed finger in Sturgeon's face, "I'm so tired of being shit on by this place and by you," and of Plaintiff's statement as they walked into the conference room: "They [Bushrod and Granderson] only get what they want because they are [either "fucking" or "freaking"] black." (*Id*.).

During her interview, Plaintiff admitted that "things probably got loud" while she was in Sturgeon's office cubicle, and that she "smacked her hand down" on Sturgeon's desk. (*Id*. ¶ 13). Plaintiff also admitted telling Sturgeon that she was tired of Bushrod and Granderson getting "special treatment" and that she refused Sturgeon's initial request to meet in the conference room. Plaintiff denied using inappropriate language and denied pointing her finger at Sturgeon. (*Id*. ¶ 14).

After taking these interviews and discussing the matter with Debra Houter, Lance's supervisor, and other senior ONB executives, Blaylock and Lance informed Plaintiff that she was being terminated for violating the following Associate Conduct and Work Rules: "Boisterous or disruptive activity in the workplace" and "Insubordination or other disrespectful conduct." (Affidavit of Kevin Blaylock ¶ 7 and Ex. 1; Lance Aff. ¶¶ 15-17).

## II.     Summary Judgment Standard

Summary judgment is appropriate if the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is material if, under the substantive law, it could affect the outcome of the suit. *Id.*; *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting that summary judgment is not appropriate if a reasonable jury could return a verdict in favor of the nonmoving party). A genuine issue exists as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In response, the non-moving party must set forth specific facts, supported by admissible evidence, showing that a genuine issue of material fact exists that must be decided at trial. *Green v. Whiteco Industries, Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 322). In making the ultimate determination of whether a genuine issue of material fact exists, the court construes the facts in the light

6

most favorable to the non-moving party and draws all reasonable inferences in favor of that party. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (citing *Anderson*, 477 U.S. at 255).

### III. Discussion

Title VII makes it unlawful for an employer to retaliate against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). A plaintiff may prove her retaliation claim under the direct and indirect methods of proof. *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 662 (7th Cir. 2006). The direct method requires her to show that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *Id*. at 663. The indirect method requires her to show that: (1) she engaged in statutorily protected activity; (2) she was performing her job to her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Id*. Once a prima facie case is set forth, the burden-shifting pretext analysis takes place. *Id*. Plaintiff proceeds under both methods of proof. Under either method, Plaintiff must establish that she engaged in statutorily protected activity.

To constitute protected expression, the complaint must indicate that the plaintiff opposed conduct prohibited by Title VII, "or at a minimum that she had a 'reasonable belief' she was challenging such conduct." *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997) (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458

7

(7th Cir. 1994)). "Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich*, 457 F.3d at 663 (citing *Gleason*, 118 F.3d at 1147).

Here, Plaintiff claims her "complaint" to Sturgeon, in which she said, "Well I feel the only reason that [Bushrod] is getting this [Friday comp day] is because she's black," constitutes protected oppositional activity. Although Plaintiff's statement of opinion invokes race, no reasonable jury could find Plaintiff reasonably believed she was challenging reverse race discrimination – i.e., that Sturgeon initially denied Plaintiff's request to change one of her bi-monthly comp days from Tuesday to Friday because she is Caucasian and Bushrod is African-American – for three reasons set forth below.

First, Plaintiff never complained to Sturgeon or to anyone in Human Resources, before the encounter at issue in this case, that Bushrod received more favorable treatment than Plaintiff because Bushrod, an African-American, had a Friday comp day. (*Id*. at 47). It simply was not an issue, at least during the time that Sturgeon was her supervisor.

Second, Plaintiff made the comment at a time when she was in the midst of a heated argument with Sturgeon over a scheduling issue. Plaintiff was admittedly loud and upset, and understood immediately that what she said was racist and inappropriate, and could subject her to termination. (*See* Plaintiff Dep. at 75 (" . . . as soon as I said what I said, it just came to me that that was an instant termination"); *see also id*. at 87 (" . . . when I said the racism thing, that after I said that, I felt like I shouldn't have said that. . . .")). Plaintiff, fearing her job was in jeopardy, asked Sturgeon to "forget" she said that,

8

and told Sturgeon she was sorry. (*Id*. at 75). Had Plaintiff reasonably believed she was the victim of reverse race discrimination, she would not have immediately thought that what she said was so inappropriately racist that it could subject her to "instant termination," and asked for Sturgeon's forgiveness.

Third, the day before the encounter at issue, Sturgeon explained to Plaintiff that, since she worked two Saturdays a month and her co-workers worked one Saturday a month, changing the comp day schedule would be complicated. Plaintiff suggested, if it would make the scheduling issue easier on Sturgeon, Plaintiff would work only one Saturday per month. (*Id*. at 54-55). This same general discussion occurred in the conference room on Saturday, *after* Plaintiff's alleged "protected activity." (*Id*. at 71). Consistent with their prior discussions, Sturgeon scheduled Plaintiff for a Friday comp day after Plaintiff agreed to work one, rather than two, Saturdays per month. (*Id*. at 62). Simply put, race played no role in the scheduling issue between Sturgeon and Plaintiff, who, by the way, are both Caucasian. *See Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 456-57 (7th Cir. 1999) (noting "it is the unusual employer who discriminates against majority employees"). In sum, the facts and the inferences to be gleaned therefrom point to an employee who lodged a racially charged remark at her supervisor not out of a concern of race discrimination, but out of anger and spite arising out of a complicated scheduling issue. This is not the type of conduct that Title VII envisioned as "protected activity."

Even if Plaintiff's "complaint" constituted protected activity, Plaintiff could not establish her retaliation claim under the indirect or direct method of proof. For purposes

9

of her indirect case, there is no evidence that her remark formed the basis for her termination. (Blaylock Aff., Ex. 1). ONB investigated the events that transpired on January 29, 2011, by interviewing the witnesses to the encounter between Plaintiff and Sturgeon. Their statements overwhelmingly support Sturgeon's account of Plaintiff's conduct. Thus, there is no evidence of record that would support an inference that ONB did not honestly believe that Plaintiff engaged in conduct prohibited by ONB's Associate Conduct and Work Rules. Accordingly, for purposes of Plaintiff's indirect case, she cannot establish that ONB's reasons for her termination are a pretext for retaliation. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 732-33 (7th Cir. 2011) (holding that the employer's reasonable investigation into the accuser's accusations supported the warden's honest belief that a prison guard violated prison rules); *Pugh v. City of Attica*, 259 F.3d 619, 629 (7th Cir. 2001) (holding that internal investigation concerning alleged misappropriation of public funds by a City employee supported City's belief that employee acted inappropriately).

    For purposes of Plaintiff's direct case, Plaintiff presented no evidence of a causal link between her alleged "protected activity" and her termination.. As noted many times by the Seventh Circuit, the fact that her termination came days after her claimed protected activity is not sufficient to establish a causal connection  Indeed, Plaintiff "presents no evidence of causation other than a chronology of the events leading up to her termination." *Kodl v. Bd. Of Educ. Sch. Dist. 45*, 490 F.3d 558, 563 (7th Cir. 2007); *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001) (holding that evidence of timing, absent other evidence of discrimination, is insufficient to survive a motion for

summary judgment). Accordingly, Plaintiff cannot establish her retaliation claim through the direct method.

### IV. Conclusion

For the reasons set forth above, the court **GRANTS** ONB's Motion for Summary Judgment (Docket # 56).


**SO ORDERED** this 21st day of May 2013.

                                                    RICHARD L. YOUNG, CHIEF JUDGE
                                                    United States District Court
                                                    Southern District of Indiana


Distributed Electronically to Registered Counsel of Record.